**Opinion issued December 30, 2014.**



In The

# Court of Appeals

For The

# First District of Texas

―――――――――――――

## NO. 01-12-00883-CV

―――――――――――――

**JULIE A. KETTERMAN, Appellant**

**V.**

**TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, Appellee**

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2011-03307J

## MEMORANDUM OPINION

The trial court sanctioned attorney Julie Ketterman for two pleadings filed in

a parental termination case and statements she made in open court.[1] Ketterman argues that the trial court abused its discretion and violated the trial court's inherent authority.

We affirm the trial court's order imposing sanctions against Ketterman. Because we do not reach the ultimate merits of Ketterman's allegations, we express no opinion as to the veracity of her claims with respect to any of the parties involved.

## Background

The Harris County Child Protective Services (CPS) interposed in D.G.C.'s life when she was born on August 28, 2009, and she and her mother, Ashley, tested positive for drugs. CPS thereafter agreed to temporarily place D.G.C. with her maternal grandmother, Rebecca Kellett, allowing Ashley to maintain access to and visitation with D.G.C. while Ashley underwent drug treatment. In November 2010, D.G.C. was taken to the emergency room after she accessed blood pressure medication that she found in the Kellett home. D.G.C. was taken to the emergency room again in April 2011 with a staph infection, necessitating partial amputation of her finger.

---

[1] The trial court imposed sanctions pursuant to Rule 13 of the Texas Rules of Civil Procedure, Chapter 10 of the Texas Civil Practice and Remedies Code, and the trial court's inherent power. *See* TEX. R. CIV. P. 13; TEX. CIV. PRAC. & REM. CODE ANN. §§ 10.001–.006 (West 2002).

On May 12, 2011, D.G.C. was taken again to the emergency room after Ashley observed the child alternately lying unresponsive, gasping for air, shaking, and turning purple. Ashley reported to hospital staff that D.G.C. had been running a high fever hours earlier and her eyes had been rolling up with a dazed stare. D.G.C., then only twenty-months old, tested positive for both opiates and cocaine.

Ashley behaved erratically at the hospital and eventually admitted to hospital staff that the night before she had taken D.G.C. to a house where she knew that people gathered and used drugs. Ashley told the hospital staff that she saw drug paraphernalia in the house and believed that the four persons there were using crack cocaine. Ashley said that she left D.G.C. only long enough to use the bathroom. When informed that her twenty-month-old granddaughter had tested positive for opiates and cocaine, Kellett claimed that she was unaware that her daughter, Ashley, was using drugs again.

On May 12, 2011, CPS removed D.G.C. from Ashley's custody and placed the child with Kellett, as Ashley requested.

A.    **Suit to Terminate Parental Rights of D.G.C.'s parents**

On May 13, 2011, Texas Department of Protective Services (DFPS) filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent Child Relationship. The petition sought, among other things, to terminate the biological parents' rights, the appointment of

3

DFPS as the child's temporary sole conservator, the appointment of a permanent managing conservator, and the appointment of an attorney ad litem for the child.

Three months later—on August 18, 2011—D.G.C. was removed from the Kellett home by CPS and placed with a foster family, Ben and Melissa Knight, after one of the Kelletts' five dogs bit D.G.C.'s face. The bite, for which the Kelletts did not seek medical treatment, left D.G.C. scarred. The caseworker who went to the Kellett home to investigate was instructed by the attorney ad litem to remove the child after the caseworker saw one of the Kelletts' dogs growling at the toddler. The next day, Ketterman filed a petition in intervention on the Kelletts' behalf.[2] Six months later, the parties reached a tentative agreement to allow the Kelletts visitation with D.G.C., if permitted by the child's therapist. D.G.C.'s attorney ad litem agreed to contact the therapist and ask for a recommendation regarding visitation by the Kelletts. The attorney ad litem was to circulate to the parties a plan, pursuant to the therapist's recommendation, to be implemented by March 30, 2012. The partial agreement regarding visitation, however, was never approved by the Court or implemented.

On March 20, 2012, attorney Gary Polland filed a petition in intervention on behalf of the Knights, D.G.C.'s foster parents. The Kelletts filed a motion to strike

---

[2]     Although the original petition in intervention was filed on Rebecca Kellett's behalf, Ketterman later filed an amended petition adding Kellett's husband— D.G.C.'s step-grandfather—as an intervener.

4

the Knights' petition that same day, alleging that the Knights lacked standing to intervene. The next month, the Kelletts filed a petition for writ of mandamus and request for emergency relief with this Court challenging the associate judge's denial of that motion to strike. Both the petition and the request for emergency relief were ultimately denied.[3]

### 1.    Second and Third Amended Petitions

On April 11, 2012, a week before a scheduled pre-trial conference, Ketterman filed a Second Amended Petition in Intervention on the Kelletts' behalf. This amended petition was filed after the trial court sustained the special exceptions to the Kelletts' petition that Polland had filed on the Knights' behalf.[4] In the Second Amended Petition in Intervention Ketterman asked that the Kelletts be appointed as D.G.C.'s temporary joint managing conservators, and that the court restrict D.G.C.'s residence to the Kelletts' home and give the Kelletts immediate possession of the child. Ketterman also made numerous allegations of bias and corruption with respect to CPS, Polland, the Harris County juvenile courts, and child abuse or neglect by the Knights and CPS, including:[5]

---

[3]    *See In re D.C.*, No. 01-12-00385-CV, 2012 WL 2150904, *1 (Tex. App.— Houston [1st Dist.] Jun. 14, 2012, orig. proceeding [mand. denied]) (mem. op.).

[4]    Neither the special exceptions nor a transcript of the hearing during which the special exceptions were addressed is included in the appellate record.

[5]    The Second and Third Amended Petitions in Intervention both contain other allegations of bias and corruption with respect to CPS, Polland, the Harris County juvenile courts, and child abuse or neglect by the Knights and CPS—all of which

5

1. "[CPS] committed child abuse and/or neglect in that they have removed [D.G.C.] from [the Kelletts] and placed [D.G.C.] in a stranger-foster home without exercising all means necessary to prevent the removal of the child from [the Kelletts]. The abuse and/or neglect is emotional."

2. "They [the Knights] have employed Gary Polland, who is in the middle of the corruption . . . . Indeed, Polland orchestrates most of the adoption scandal."

Two days later, Ketterman filed a motion to withdraw the Second Amended Petition in Intervention. She also filed a Third Amended Petition in Intervention, which omits the prior petition's allegations against Polland, but continues to allege bias in favor of adoption in general, and the Knights in particular, and wrongdoing on behalf of CPS/DFPS.

## 2. Pre-trial Hearing—April 17, 2012[6]

---

are set forth in the sanctions order. It is not necessary for this Court to rehash these allegations, so long as we determine that the trial court did not abuse its discretion by finding that one or more of the allegations addressed in this opinion violates Rule 13 or Chapter 10, or that Ketterman engaged in conduct subject to sanction by virtue of the trial court's inherent authority.

[6] Ketterman contends that any reliance upon statements made during the April 17th pre-trial hearing is improper and violates her rights to due process because she had no notice that the court was going to inquire about the contents of her pleadings at that time. In particular, Ketterman argues: "Any statements made by Ms. Ketterman or any other attorney during [the April 17, 2012] hearing cannot be used as evidence to support the trial court's ruling. Not only did Ms. Ketterman have no notice that the court's questioning would take place, no one was placed under oath and no evidence was actually offered into the record."

Ketterman failed to preserve any challenge to the sanctions award on due process grounds. When an attorney fails to complain of a sanction on a particular ground and ask the trial court to reconsider its actions on that basis, the attorney waives any complaint about the trial court's action with respect to that ground. *See* TEX. R. APP. P. 33.1(a)(1) (stating that to preserve error for appeal, party must make

6

Due to the gravity of the allegations, the trial court questioned Ketterman extensively during the April 17, 2012 pre-trial hearing about the statements included in the second and third amended petitions in intervention. Ketterman told the court that the factual basis for most of her claims was the "educated opinion" she had formed based on unspecified research that she had conducted, data she had reviewed, including statistics included in the 2011 DFPS Data Book, and her own experiences representing clients before the juvenile courts. In particular, when the trial court asked Ketterman to provide a factual basis for her claim that Polland "orchestrates most of the adoption scandal" in Harris County, Ketterman responded, "It's only my opinion." Ketterman also repeatedly refused to answer inquiries about her allegations against Polland because she believed that she and Polland had agreed that they would not address these issues in the trial court. When asked to explain the factual basis for her allegations of bias and corruption with respect to CPS, Polland, and the Harris County juvenile courts, Ketterman repeatedly refused to answer the trial court's questions or "get into specifics"

timely and sufficiently specific objection in trial court); *see generally Kiefer v. Cont'l Airlines, Inc.*, 10 S.W.3d 34, 41 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (finding sanctioned law firm waived complaint by not objecting at trial court level). Here, although the trial court's sanctions order quoted extensively from the pre-trial hearing—thus, putting Ketterman on notice that the court was relying upon statements made during that proceeding for purposes of imposing sanctions—Ketterman did not argue in her motion for reconsideration that the trial court's consideration of, or reliance upon, such statements was improper—much less that it violated her due process rights. Accordingly, Ketterman failed to preserve any due process argument for our review.

7

because, she claimed, such matters were currently "under investigation." At one point, when Ketterman was asked to explain and provide some factual basis for her claim that D.G.C.'s removal from the Kelletts' home and placement with the Knights amounted to "corruption," Ketterman responded that she was not going to get into the facts of her case during the hearing (i.e., "I have a right to defend my case and not here in front of this. . . . You'll hear the facts as the trial progresses.")

On April 18, 2012—the day after the pre-trial hearing—Ketterman filed a "fifth"[7] amended petition in intervention on the Kelletts' behalf, which omitted the specific allegations of bias and wrongdoing on behalf of CPS/DFPS set forth in the second and third amended petitions in intervention, and instead generally alleged that CPS/DFPS's goal of "stranger-adoption" may cause "long-term emotional damage to the child" because the family ties between the child and grandparents are severed, and that was not in the child's best interest. A "sixth"—and final— amended petition in intervention was filed on the Kelletts' behalf on May 12, 2012. The second and third amended petitions in intervention contain the allegations that are the subject of the trial court's sanctions order and the present appeal.

### 3. Sanctions

On June 1, 2012, DFPS sought sanctions against Ketterman based upon her second and third amended petitions, which included allegations of corruption at

---

[7] A "fourth" amended petition in intervention was never filed on the Kelletts' behalf.

CPS, including and involving Polland. DFPS's sanctions motion alleged violations of Rule 13 and Chapter 10 and requested sanctions in the amount of $3,000 payable to Harris County for "court costs, unnecessary witnesses' expenses and time wasted and reasonable attorney's fees." On June 12, 2012, D.G.C.'s attorney ad litem also filed a motion for sanctions against Ketterman pursuant to Rule 13 and Chapter 10 requesting $5,000 in monetary sanctions payable to Harris County. On June 19, 2012, Polland filed a motion on the Knights' behalf seeking $14,000 in attorney's fees as sanctions against Ketterman pursuant to Rule 13 and Chapter 10.

The trial court held a two-day evidentiary hearing on the motions for sanctions on June 14, 2012 and June 29, 2012. Various witnesses testified at the hearing, including Ketterman, who was questioned extensively about the contents of the second and third amended petitions in intervention and her decision to withdraw those petitions. Specifically, when was asked why she withdrew the second amended petition in intervention after only two days, Ketterman testified that her reasons for withdrawing the petition went to her work product and legal strategy and that she could say only that she did not withdraw the petition because it was frivolous or groundless. She stated she did not recall why she withdrew her third amended pleading, but reiterated that it was not because the pleading was frivolous or groundless. When asked why the allegations regarding CPS,

9

corruption, not following the law and conspiracy with Polland were omitted from her fifth amended petition in intervention, Ketterman replied that she "made the decision to fight that battle outside of the courtroom." Ketterman stated that she still believed that CPS and Polland were involved in corruption, but did not include her allegations against Polland in the third amended petition in intervention because she believed—incorrectly—that she and Polland had a "mutual agreement" that they would "deal with [those issues] outside the courtroom." When asked if she had any facts to support her allegation that D.G.C.'s removal from the Kelletts' house amounted to "child abuse," Ketterman admitted that she did not. Ketterman later claimed that Dr. David Watchel was a fact witness who was going to testify that D.G.C. suffered child abuse because she was separated from her grandparents. Ketterman acknowledged, however, that she did not list Dr. Watchel as a witness in her disclosures, and upon on further questioning, admitted that Dr. Watchel never examined D.G.C. Ketterman also testified that the manner in which CPS removed D.G.C. from the Kelletts' home was abusive because they removed the child after the danger (i.e., the dog that bit the child on the face) had been removed from the home.

Ketterman also testified at the sanctions hearing that she marketed herself as a zealous advocate and that this was not the first time she had alleged that CPS was corrupt. According to Ketterman, she began her own personal investigation into

10

corruption and wrongdoing by CPS, Polland, the juvenile courts, and others about five or six years before. As she told the court during the April 17th pre-trial hearing, Ketterman reiterated at the sanctions hearing that her claims of corruption and bias were largely based on her "educated opinion." Although she had told the trial court during that pre-trial hearing that she had data supporting her opinion, Ketterman did not provide any such data or factual support during the sanctions hearing. Ketterman also repeatedly refused to answer many of the parties' and the trial court's questions regarding the factual bases for her accusations, claiming that doing so would prematurely reveal her "trial strategy" and she would provide her evidence during the trial on the merits.

After one such exchange, the trial court reminded Ketterman that the purpose of the sanctions hearing was to determine whether her "petition and the things [she] asserted as far as corruption is concerned, whether or not those are groundless and whether or not [she had] some facts to back that up." The trial court further stated:

> You are asked to give that information today in this motion for sanctions. It's highly likely that if you don't have any facts to back up your assertions that I wouldn't have much alternative but to find that you had no factual basis.
>
> And because we're here today to determine that, I'm not under any obligation to you to wait until the trial of the case to decide whether or not you want to put on whatever type of evidence you want. So it's totally up to you. I'm not telling you what to do, but I want to make sure you have an understanding that in this motion hearing today you

11

are being given the opportunity to present the facts that support your assertions with respect to corruption and the other allegations that you've made.

At the [pre-trial] hearing that we had a couple of months ago, you declined to bring forth facts because you said that it would violate some form of investigation. You didn't make any comments about that it was your trial strategy. You changed your statement from that time today to say that it would violate your trial strategy and or attorney client privilege. And you're not mentioning this investigation that you say that you're a part of.

So the only thing I can tell you is I have to make a decision today based on the evidence that's presented and you have the opportunity to show today that there are facts that support these assertions that you made. I don't think these guys that are asking you questions can turn you upside down and shake you, but they're asking you the questions and you're [going to] answer them, that's fine, but if you're not, then I just have go forward with what I have. I just want to make sure you understand that.

Ketterman responded, "Yes, sir. I understand." Despite having previously told the court that she had data to support her opinions and the trial court's admonishments, Ketterman did not bring forth any data, witness testimony (other than her own), or other evidence supporting her allegations during the two-day hearing on the various motions for sanctions.

Ketterman later testified that she had a conversation with a former assistant county attorney that she believed backed up her serious allegations regarding corruption as to Polland specifically. In particular, Ketterman testified that Henry Burkholder told her that Polland was involved with the judges in viewing pictures of potentially adoptive children and deciding who would get adopted and who

would not. Ketterman admitted that Burkholder was her only source for her claim that Polland "orchestrates most of the adoption scandal" and that if Burkholder were to testify that he never told her that Polland and the juvenile court judges looked at photographs of children in order to determine which ones were adoptable, she would have nothing to substantiate her allegation.

Q.    You understand Mr. Burkholder's coming to testify too. We're [going to] find out what he really did tell you.  You understand that, don't you?

A.    I understand that. Yes.

 . . .

Q.    [I]f Mr. Burkholder comes in and said I never told Julie Ketterman that, you have nothing else to substantiate the allegation you made that Gary Polland orchestrates most of the adoption scandal, do you?

A.    Correct.

Q.    So just to be clear, Henry Burkholder told you that Gary Polland . . . is involved with the judges in viewing pictures of potential adoptive children and decide who gets adopted and who doesn't?

. . .

A.    Yes.

Q.    Okay. You understand you're under oath?

A.    Absolutely.

Q.    You understand Mr. Burkholder's coming to testify too. We're [going to] find out what he really did tell you. You understand that, don't you?

A.    I understand that. Yes.

. . .

Q.    [I]f Mr. Burkholder comes in and said I never told Julie Ketterman that, you have nothing else to substantiate the allegation you made that Gary Polland orchestrates most of the adoption scandal, do you?

A.    Correct.

At the sanctions hearing, Henry Burkholder testified that he only had one five-minute telephone conversation with Ketterman within the previous month and during that conversation he and Ketterman had talked about a former juvenile court judge looking at photographs of children. Burkholder, however, later clarified that ad litems are required to attach photographs of the children to their reports because "[i]t tends to humanize the process." According to Burkholder, he was referring to these types of photographs when he spoke with Ketterman. Burkholder noted that it was "very common during a typical hearing for photos to be passed around, like you show your family photos."

Burkholder also denied, inter alia, (1) telling Ketterman that Polland "orchestrates most of the adoption scandal," (2) telling Ketterman that Polland was in the middle of corruption, (3) being aware of any adoption scandal, (4) telling Ketterman "that the pictures that the judge or judges looked at in this instance, in this particular discussion about judges looking at pictures, were for the purpose to decide which ones were adoptable," (5) telling Ketterman that decisions

14

concerning adoptions are made by judges looking at photographs, (6) witnessing an instance in which "decisions concerning adoption for placement was made by viewing photographs by the judge and attorneys," or (7) that Polland was involved with the judges in viewing pictures of potential adoptive children and deciding who gets adopted. In fact, Burkholder denied saying anything that would make Ketterman believe that Polland "was involved in any form of corruption."

In addition to Burkholder, the attorney ad litem also called several other witnesses to testify during the sanctions hearing, including D.G.C.'s caseworker, Akasha Kerr, and John Odam, the managing attorney for the county attorneys that work in the juvenile courts.

Akasha Kerr, the caseworker who removed D.G.C. from the Kelletts' home, testified that CPS had conducted a home study of the Kelletts' home, but the study not approved. She also testified that, in addition to the grandparents, CPS had "considered three other potential placements within the family, and worked extensively with the family prior to the child being removed from the home." According to Kerr, D.G.C. was ultimately removed from the Kelletts' home because (1) the Kelletts' home study was not approved, (2) D.G.C. was bit by a dog while in the Kelletts' home and the Kelletts did not seek medical attention for her, (3) D.G.C. overdosed on blood pressure medication she found in the Kellett home, (4) the Kelletts admitted during the home study that they did not wish to

care for their granddaughter long term (i.e., they did not wish to adopt her), and (5) the Kelletts admitted during the home study that they drank alcohol on a daily basis and were taking multiple medications. Kerr testified that D.G.C. had not experienced any more drug overdoses or dog bites since being placed with the Knights. Kerr also denied that D.G.C.'s removal from the Kelletts' home constituted "child abuse or neglect."

Odam testified that he had no personal knowledge of CPS, Polland, the attorneys ad litem, and the juvenile courts engaging in corruption or being involved in any adoption scandal. He also testified that although he and the First Assistant County Attorney had met at a state senator's office with Ketterman and a member of the senator's staff to discuss Ketterman's concerns regarding CPS adoptions, no one in the County Attorney's Office participated in or conducted an investigation regarding Ketterman's corruption claims.

At the end of the sanctions hearing, the trial court informed the parties that he would have "some decision out" the following week. The court did not rule on the sanctions motions, however, until the underlying case was resolved two months later.

**B.    Resolution of the Underlying Case and the Sanctions Order**

On August 21, 2012, the Kelletts and the Knights entered into a Rule 11 Agreement in which the Kelletts agreed to withdraw their request for a jury trial

16

and refrain from filing any further suits under the Texas Family Code with respect to D.G.C. In return, the Knights agreed to foster a relationship between D.G.C. and the Kelletts, so long as it was in the child's best interest, as determined by the Knights. The parties also agreed that DFPS should remain as D.G.C.'s sole managing conservator until D.G.C. was adopted. The parties presented the Rule 11 Agreement to the court that same day. At the hearing, D.G.C.'s biological father testified that he had willingly and voluntarily signed an affidavit of relinquishment, relinquishing his parental rights with respect to D.G.C.

After presentment of the Rule 11 Agreement and the biological father's testimony, the court announced that it was imposing monetary sanctions against Ketterman, in the amount of $1,500 payable to Harris County and $1,500 payable to the Knights, and ordering Ketterman to enroll in ten hours of continuing legal education ethics courses.[8] That same day, the court signed a written order, finding that Ketterman violated Rule 13 and Chapter 10, and engaged in conduct subject to sanction pursuant to the court's inherent authority.

The sanctions order quoted several allegations of bias and corruption with respect to CPS, Polland, the Harris County juvenile courts, and child abuse or neglect by the Knights and CPS, all of which were included in the second and third

---

[8] Ketterman's appellate brief contains no argument addressing the trial court's choice of sanctions, and she does not appear to challenge the amount of the monetary sanctions or the requirement that she complete ten hours of ethics training in addition to the hours required for continuing legal education.

17

amended petitions that Ketterman filed. The order also recited particular evidence regarding why the trial court found Ketterman's pleadings frivolous/groundless and why she was guilty of abusing the judicial process and acting in disregard of procedural and professional directives.

In particular, the trial court noted that when she was questioned regarding her second and third amended petitions in intervention during the April 17th pre-trial hearing, Ketterman informed the court that the allegations set forth in those pleadings were based on her "own research, the 2011 data book, as well as the research" that she had "done over the state of Texas." Ketterman explained that

> [I]t's not just what's in this book [the annual report and data book]. It's the statistics in this book that are taken along with other research that I've done and it's an opinion, what I believe to be an educated opinion, that I formulated based on an array of data and information that I've brought in. It's an educated opinion formulated from an array of data I've gotten from other attorneys, from child's rights groups, form my own cases, from the CPS policies and procedures and also from federal statutes.

The sanctions order further noted that

> When given a copy of [the] annual report and data book, Ms. Ketterman could not show anything in the book that suggested that CPS was corrupt, nor could she point to any information that would lead her to make the determination that CPS was corrupt. When asked "So you don't have any—there's nothing in that book that says CPS in engaging in corruption", Ms. Ketterman replied "No, sir." In response to the question "There's nothing in that book that says that district court judges in this building [the Harris County Juvenile Justice Center] are corrupt", Ms. Ketterman responded, "No, sir."

18

When asked whether there was anything in the book that dealt with the assertions in her petition "dealing with the ongoing corruption [on] a daily basis, between CPS, juvenile courts and attorneys ad litem," Ms. Ketterman stated, "Yes, sir, there is." When asked to explain what portion of the CPS annual report and data book supported her allegations, she pointed to page 33 and explained that her opinions were based on the 2004 statistics regarding "adoptions consummated" from region six, which includes Houston. She did not have any more recent data to support her allegations.

On the record, Ms. Ketterman said that the corruption was pervasive: "The corruption of the juvenile court system having to do with the juvenile court system, having to do with the judges of the 313th, 315th and the associate judge of the 314th." When asked specifically what corruption she was claiming, Ms. Ketterman said "the corruption is everybody is selling white children to the foster parents. If this were a black family, it wouldn't be happening." Ms. Ketterman further claimed that this alleged corruption was "something that's currently under investigation", and that "the actions on this case and other cases are under investigation", but she was "not [going to] get into specifics."

The sanctions order further stated that during the sanctions hearing:

When asked "what facts do you [Ms. Ketterman] have to substantiate that Mr. Polland, CPS, district court judges, attorney ad litems are engaged in corruption," Ms. Ketterman answered that she was not going to "give you my evidence" and that to do so would violate the duty an attorney owes to her clients and would reveal her "trial strategy."

When again asked what her factual basis was for her pleadings alleging corruption involving Mr. Polland, attorney for the [Knights], CPS, the juvenile courts, certain attorneys ad litem and her statement that Mr. Polland "orchestrates most of the adoption scandal and makes his fortune off of the County" by not fighting for the "best interest of the child but for the adoption to take place," Ms. Ketterman stated under oath that her claims were based on a "[c]onversation [she] had with Henry Burkholder," a former Assistant County Attorney. She claimed that Mr. Burkhokler had told her that Mr. Polland "would be

19

involved specifically with the judges, showing different pictures of different kids to decide which ones were adoptable and which weren't."

The sanctions order also noted that Burkholder was called as a witness during the

sanctions hearing and:

> When [Burkholder was] asked if he ever made any statements to the effect that Mr. Polland was in the middle of the corruption that goes on a daily basis between CPS, juvenile courts and a handful of attorneys ad litem and that Mr. Polland "orchestrates most of the scandal and makes a fortune with the county," Mr. Burkholder testified that he "never said any such thing that would lead to [those] allegations."

The court further noted that

> Mr. Burkholder's testimony indicated that 1) he never observed corruption on the part of CPS, a district court judge, Mr. Pollard or any other attorneys ad litem; 2) he never observed any type of adoption scandal by CPS or anyone else; 3) he did not think CPS treats white children differently than minority children; 4) he never told Ms. Ketterman that CPS benefits financially from placing children up for adoption; and 5) while he was aware of an investigation of such allegations by the Harris County Attorney's Office before 2007, he had no knowledge of the result of that investigation or of a current investigation. Mr. Burkholder also stated that he never told anyone that there was an investigation and that he did not have any experience of or information that CPS violates the law and its own policies in dealing with the placement of children.

> Upon questioning by Ms. Ketterman, Mr. Burkholder testified that he only had one conversation with Ms. Ketterman and that it took place on the telephone "within the last month" (May/June, 2012). On examination by the ad litem, Mr. Burkholder indicated that he believed the conversation with Ms. Ketterman took place after she filed the April 11, 2012, the pleading now in controversy.
> . . . .

> In response to questions by the Court, Mr. Burkholder indicated that 1) he never told Ms. Ketterman that Gary Polland was involved with the judges in viewing pictures of potential adoptive children to decide who was and was not going to be adopted; 2) he had no knowledge of any corruption involving how CPS handled "white babies"; and 3) that his conversation with Ms. Ketterman lasted about five minutes.

The court then summarized the testimony of assistant county attorney Odam and CPS caseworker Kerr and noted that

> After being called to the stand, Ms. Ketterman testified that she would present evidence of her allegations at trial. She said that she believed "I have what I need to substantiate" those claims and that it was "up to a fact finder, a jury", to determine whether her allegations were true.

> Based on these and other recited facts, the trial court found that Ketterman

was "guilty of abusing the judicial process" and that her "frivolous filings . . . caused the Court and the other parties undue delay, expense and vexation." The court also found that "Ketterman's actions needlessly increased the cost of litigation and [her] pleadings included claims and contentions that were either frivolous or not warranted by existing law." The trial court further found that the sanctions were "reasonable and just and assessed in relation to the expenses, time and abuse of the judicial process caused by [Ketterman's] conduct" and that such sanctions were designed to educate and deter such conduct. The trial court also stated:

> While this Court appreciates and encourages strong advocacy, it cannot approve or excuse Ms. Ketterman's ad hominem attacks on opposing counsel and our sister courts. A distinction must be drawn

21

between respectful advocacy and judicial denigration. The former is entitled to a protected voice, but the latter can only be condoned at the expense of the public's confidence in the judicial process. *See Gleason v. Isbell*, 145 S.W.3d 354 (Tex. App.—Houston. [14th Dist.] 2004, no pet.).

Ketterman filed a motion to reconsider the sanctions order and attached various documents which she argued supported her factual allegations.[9] The motion was denied.

On August 28, 2012, the trial court signed the final order terminating D.G.C.'s biological parents' rights based on their voluntary relinquishments and incorporating the Rule 11 Agreement. This appeal of the sanctions order followed.

## Standard of Review

We review a trial court's imposition of sanctions for an abuse of discretion. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007) (stating standard of review applies to sanctions imposed pursuant to Rule 13 and Chapter 10); *In re Bennett*, 960 S.W.2d 35, 40 (Tex. 1997) (reviewing trial court's imposition of sanctions pursuant to its inherent authority for abuse of discretion). Under this standard, an appellate court may reverse a trial court's ruling only if the trial court acted without reference to any guiding rules and principles such that its ruling was

---

[9] The materials and research attached to the motion for reconsideration, however, consist largely of newspaper articles and emails—most of which are focused on a former juvenile court judge and to a lesser extent, the presiding judge of the 314th District Court. A copy Ketterman's petition for writ of mandamus challenging the associate judge's denial of her motion to strike the Knights' plea in intervention, along with the appendix she filed in that case, is also attached to the motion for reconsideration.

arbitrary or unreasonable. *Low*, 221 S.W.3d at 614. As fact finder, the trial court is entitled to evaluate the credibility of the testimony and determine what weight to give it. *Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 412 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). The legal sufficiency of evidence heard by a trial court is a relevant factor in assessing whether the court abused its discretion in imposing sanctions. *Armstrong v. Collin Cnty. Bail Bond Bd.*, 233 S.W.3d 57, 62 (Tex. App.—Dallas 2007, no pet.) (citing *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991)).

For the purposes of Chapter 10 and Rule 13, courts presume pleadings, motions, and other papers are filed in good faith. *Thottumkal v. McDougal*, 251 S.W.3d 715, 718 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). The party moving for sanctions bears the burden of overcoming this presumption. *Low*, 221 S.W.3d at 614 (citing *GTE Commc'ns Sys. Corp. v. Tanner*, 856 S.W.2d 725, 731 (Tex. 1993) (orig. proceeding)).

In this case, the trial court imposed sanctions pursuant to Rule 13 of the Texas Rules of Civil Procedure, Chapter 10 of the Texas Civil Practice and Remedies Code, and the trial court's inherent power. *See* TEX. R. CIV. P. 13; TEX. CIV. PRAC. & REM. CODE ANN. §§ 10.001–.006 (West 2002). If the trial court's imposition of sanctions is supported under any one of these legal bases, we will

affirm the order. *See Zeifman v. Nowlin*, 322 S.W.3d 804, 809 (Tex. App.—Austin 2010, no pet.).

## Texas Rule of Civil Procedure 13

Ketterman contends that the trial court abused its discretion by sanctioning her pursuant to Rule 13 because (1) there is no evidence that the second or third amended petitions contained groundless allegations, and (2) even if the pleadings contained groundless allegations, there is no evidence that either pleading was brought in bad faith or for the purpose of harassment.[10]

### A.    Applicable Law

Rule 13 provides sanctions for a party filing a pleading that is groundless and brought in bad faith or groundless and brought to harass. TEX. R. CIV. P. 13. Specifically, Rule 13 provides in relevant part, that:

> The signatures of attorneys . . . constitute a certificate by them that . . . to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment. . . . If a pleading . . . is signed in violation of this rule, the court, upon motion or its own initiative, after notice and hearing, shall impose an appropriate sanction available under Rule 215. . . .

---

[10]    On appeal, Ketterman argues that "the trial court's [sanctions] order does not contain a finding that Ms. Ketterman's pleadings were groundless, or any similar language that would indicate that Ms. Ketterman's actions violated Rule 13." Ketterman, who did not raise this issue in her motion for reconsideration of the sanctions order, has waived this argument. *See Gomer v. Davis*, 419 S.W.3d 470, 478 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *see also Robson v. Gilbreath*, 267 S.W.3d 401, 407 (Tex. App.—Austin 2008, pet. denied) (stating that failure to object to form of sanctions order waives objection to lack of specific findings).

TEX. R. CIV. P. 13. Under this rule the moving party must demonstrate that (1) the offending party's pleadings are groundless, and (2) that such pleadings were filed either in bad faith or to harass. *Id.* A groundless pleading is one that has "no basis in law or fact and [is] not warranted by good faith argument for the extension, modification, or reversal of existing law." *Id.* Groundlessness is more than an ultimate determination that the claim is not a winner. *See Emmons v. Purser*, 973 S.W.2d 696, 700 (Tex. App.—Austin 1998, no pet.).

To determine if a pleading was groundless, the trial court must objectively ask whether the party and counsel made a reasonable inquiry into the legal and factual basis of the claim at the time the pleading was filed. *See Loeffler v. Lytle Indep. Sch. Dist.*, 211 S.W.3d 331, 348 (Tex. App.—San Antonio 2006, pet. denied). "Reasonable inquiry" means the amount of examination that is reasonable under the circumstances of the case. *Robson v. Gilbreath*, 267 S.W.3d 401, 406 (Tex. App.—Austin 2008, pet. denied) (citing *Monroe v. Grider*, 884 S.W.2d 811, 817 (Tex. App.—Dallas 1994, writ denied)). We review reasonable inquiry by looking at the facts available to the attorney and the circumstances that existed when the attorney signed and filed the pleading or motion. *See Robson*, 267 S.W.3d at 405; *Elkins v. Stotts–Brown*, 103 S.W.3d 664, 668 (Tex. App.—Dallas 2003, no pet.).

In deciding whether a pleading was filed in bad faith or for the purpose of harassment, the trial court must consider the acts or omissions of counsel, not merely the legal merit of a pleading or motion. *See Parker v. Walton*, 233 S.W.3d 535, 540 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Bad faith is the conscious doing of a wrong for dishonest, discriminatory, or malicious purposes; bad faith does not exist when a party merely exercises bad judgment or is negligent. *Thielemann v. Kethan*, 371 S.W.3d 286, 294 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (citing *Elkins*, 103 S.W.3d at 669)). A party acts in bad faith if he has been put on notice that his understanding of the facts may be incorrect and he does not make reasonable inquiry before pursuing the claim further. *Robson*, 267 S.W.3d at 407. Moreover, a pleading is filed for the purpose of harassment if it is filed with the intent to annoy, alarm, and abuse another person. *See Thielemann*, 371 S.W.3d at 294 (citing *Elkins*, 103 S.W.3d at 669); *see also Parker*, 233 S.W.3d at 539–40. Intent to harass may be proven with either direct or circumstantial evidence. *Schexnider v. Scott & White Mem'l Hosp.*, 953 S.W.2d 439, 441 (Tex. App.—Austin 1997, no writ) (holding intent under Rule 13 may be shown with circumstantial evidence); *see also Scheel v. Alfaro*, 406 S.W.3d 216, 227 (Tex. App.—San Antonio 2013, pet. denied) ("Intent for purposes of Rule 13 may be proven by circumstantial evidence as well as direct evidence.").

**B.** **Are any of allegations in the second or third amended petitions groundless, and if so, was the petition containing the groundless allegation filed either in bad faith or in order to harass?**

The second and third amended petitions in intervention contain numerous allegations of bias, corruption, and other wrongdoing with regard to Polland, CPS, and the Knights. It is not necessary for this Court to address each of these allegations, so long as we determine that the trial court did not abuse its discretion by finding that one or more of these allegations violates Rule 13 (i.e., the allegation is groundless and brought in bad faith or groundless and brought to harass). *See* TEX. R. CIV. P. 13.

> **1.** **"[CPS] committed child abuse and/or neglect in that they have removed [D.G.C.] from [the Kelletts] and placed [D.G.C.] in a stranger-foster home without exercising all means necessary to prevent the removal of the child from [the Kelletts]. The abuse and/or neglect is emotional."**

When asked to provide a factual basis for her allegation in the Second Amended Petition in Intervention that CPS "committed child abuse and/or neglect" with respect to D.G.C., Ketterman answered that D.G.C.'s removal from her grandparents' home, in and of itself, constituted emotional abuse, and that the manner in which CPS removed the child was also emotionally abusive. Ketterman testified that when she made the allegation of child abuse and neglect, she had a witness—a doctor—who would testify to the fact that D.G.C. suffered child abuse by separation from her grandparents. Ketterman admitted that she had no evidence

27

regarding any behaviors exhibited by D.G.C. which would corroborate her claim of child abuse and neglect, and that although the doctor would have testified that children *in general* suffer emotionally from removals, the doctor she contacted never examined D.G.C.—either before or after Ketterman accused CPS of child abuse and neglect—or provided any reports regarding the child. Ketterman also testified that the manner in which CPS removed D.G.C. from the Kelletts' home was emotionally abusive because CPS removed the child after the danger had been removed from the home (i.e., the dog that bit D.G.C. on the face).

As the court noted in the sanctions order, Kerr, D.G.C.'s CPS caseworker, refuted Ketterman's claims that CPS removed D.G.C. "without exercising all means necessary to prevent the removal of the child from [the Kelletts]." In particular, Kerr testified at the sanctions hearing that "CPS had conducted a home study on the Kelletts, considered three other potential placements within the family, and worked extensively with the family prior to the child being removed from the home." She further testified that "neither she nor CPS committed child abuse or neglect by removing the child from [the Kelletts'] home." Kerr also testified that D.G.C. was ultimately removed from the Kelletts' home for several reasons, not only because of the dog bite.

Thus, the record contains evidence indicating that (1) Ketterman did not make a reasonable inquiry before alleging that CPS committed child abuse or

28

neglect by removing D.G.C. from the Kelletts' home and placing her with the Knights, and (2) there is no factual basis for these specific claims with respect to D.G.C., CPS, or the Knights. In fact, there is no evidence that the removal constituted abuse or neglect—much less that D.G.C. was actually harmed by the removal.

Although Ketterman attached several documents to her motion to reconsider the sanctions order, none of these documents support Ketterman's allegation that CPS committed child abuse or neglect by removing D.G.C. from the Kelletts' home and placing her with the Knights. In fact, one of Ketterman's documents—a transcript from a permanency hearing in the case that occurred three weeks *before* Ketterman filed the second amended petition—substantially *undermines* Ketterman's position and is further evidence that Ketterman did not make a reasonable inquiry into the matter before filing the second amended petition in intervention. In particular, the hearing transcript supports Kerr's testimony regarding CPS's efforts to keep D.G.C. in the Kellett home and find a permanent family placement for the child before placing D.G.C. with the Knights, and CPS's reasons for removing D.G.C. from the Kellett home. During the permanency hearing, the attorney ad litem informed the court that D.G.C.'s therapist recommended that the child have no visitation with the Kelletts, unless it was implemented gradually and the visits were for short periods of time and supervised

29

by the Knights. According to D.G.C.'s therapist, the toddler appeared to be suffering from post-traumatic stress and anxiety, and visitation with the Kelletts would likely cause the child to regress. Although the Knights told the trial court that they were okay with the Kelletts having supervised visitation, the attorney ad litem disagreed and opposed any court-ordered visitation, based on his conversations with D.G.C.'s therapist.

The court also heard testimony from one of Ashley and Ms. Kellett's relatives during that hearing. That relative, who knew D.G.C. and was fostering two of D.G.C.'s first-cousins at the time, testified that she believed that the Kelletts were "good with" D.G.C. "when Ashley [was] out of the picture," and that they should be involved in their grandchild's life. Nevertheless, she also expressed concern that court-ordered visitation with the Kelletts at this stage could be harmful to D.G.C. and cause her to regress, and urged that any visitation be gradual and reevaluated regularly. The relative also testified that Ms. Kellett enabled Ashley and could not protect D.G.C. from Ashley if D.G.C. was living in the Kelletts' home. According to the witness, "the relationship between [Ms. Kellett] and Ashley has always been enabler, [sic] violent, just constant bickering interaction . . . it's a volatile situation, a volatile relationship."

As such, there is some evidence supporting the trial court's conclusion that Ketterman's allegation of child abuse and neglect by CPS with respect to D.G.C.

30

was groundless. Thus, the first prong of the test justifying the imposition of sanctions under Rule 13 is satisfied.

Ketterman argues that there was no evidence that she signed either pleading in bad faith or with the intent to harass. On the contrary, there is evidence from which the court could have reasonably inferred that Ketterman filed her second amended petition—which included a groundless accusation of child abuse and neglect against CPS—in bad faith or with intent to harass CPS. In particular, Ketterman testified that she markets herself as a "zealous advocate" who has "problems with CPS" and that she has raised, or attempted to raise, allegations of corruption against CPS in other juvenile court proceedings. Ketterman even attached to her motion to reconsider a transcript from a wholly unrelated parental termination case in which she attempted unsuccessfully to elicit testimony from Alice Massey, a former CPS caseworker who admitted to being fired from the agency, accusing CPS of corruption and wrongdoing in that case.

One of the documents attached to Ketterman's motion to reconsider also *supports* the trial court's implicit finding that the second amended petition in intervention was filed in bad faith or with the intent to harass CPS. *See Robson*, 267 S.W.3d at 407 (reviewing record for any evidence supporting trial court's implicit finding that claim was brought in bad faith or for purposes of harassment). In particular, testimony elicited during the March 20, 2012 permanency hearing in

31

D.G.C.'s case should have put Ketterman on notice that, although children in general may suffer emotionally from removals, as Ketterman argued during the sanctions hearing, the removal of D.G.C. from her grandparents' home, under these circumstances, was neither abusive nor neglectful, particularly given the physical injuries D.G.C. suffered while living in the Kellett home and the attorney ad litem's opposition to D.G.C. having any court-ordered visitation with the Kelletts based on D.G.C.'s therapist's opinion that the toddler appeared to be suffering from post-traumatic stress and anxiety, and that visitation with the Kelletts would likely cause her to regress. *See Robson*, 267 S.W.3d at 407 (stating party acts in bad faith if, after being put on notice that his understanding of facts may be incorrect, he does not make reasonable inquiry before further pursuing claim). Although Ketterman argued during the sanctions hearing that D.G.C. was improperly removed based on the dog bite, and that it was not necessary to remove the child because the dog had already been removed from the home, the transcript reflects that D.G.C. was removed from the Kelletts' home after *several* incidents, including the dog bite, a staph infection that resulted in amputation of part of the D.G.C.'s finger, and drug and "protection" issues.

Thus, the trial court could reasonably infer from this testimony and evidence that Ketterman filed the second amended petition in bad faith or with the intent to harass, and, as such, the second prong of the test justifying the imposition of

32

sanctions under Rule 13 is satisfied. *See Robson*, 267 S.W.3d at 407 (reviewing record for any evidence supporting trial court's implicit finding that claim was brought in bad faith or for purposes of harassment).

## 2.   Polland "orchestrates most of the adoption scandal."

When asked to provide a factual basis for her allegation that "Polland orchestrates most of the adoption scandal," Ketterman named former Harris County attorney Henry Burkholder as her source. When asked specifically what Burkholder told her, Ketterman responded, "That [Polland] would be involved specifically with the judges, showing different pictures of different kids to decide which ones were adoptable and which weren't." Ketterman testified that she spoke with Burkholder before she filed her amended petitions and that he was her only source for her claim that Polland "orchestrates most of the adoption scandal." Ketterman admitted that if Burkholder were to testify that he never told her that Polland and the juvenile court judges looked at photographs of children in order to determine which ones were adoptable, she would have nothing to substantiate her allegation that Polland "orchestrates most of the adoption scandal."

Indeed, as the trial court stated in its sanction order, Burkholder testified at the sanctions hearing and contradicted virtually all of Ketterman's claims. In particular, Burkholder testified that he only had one, five-minute telephone conversation with Ketterman within the last month. "Burkholder indicated that he

believed the conversation with Ms. Ketterman took place after she filed the April 11, 2012, the pleading now in controversy." Burkholder admitted that he and Ketterman talked about a former juvenile court judge looking at photographs during their brief conversation, but later clarified that ad litems are required to attach photographs of the children to their reports because "[i]t tends to humanize the process." According to Burkholder, he was referring to these sorts of photograph when he spoke with Ketterman. Burkholder noted that it was "very common during a typical hearing for photos to be passed around, like you show your family photos."

Burkholder also denied, inter alia, (1) telling Ketterman that Polland "orchestrates most of the adoption scandal," (2) telling Ketterman that Polland was in the middle of corruption, (3) being aware of any adoption scandal, (4) telling Ketterman "that the pictures that the judge or judges looked at in this instance, in this particular discussion about judges looking at pictures, were for the purpose to decide which ones were adoptable," (5) telling Ketterman that decisions concerning adoptions are made by judges looking at photographs, (6) witnessing an instance in which "decisions concerning adoption for placement was made by viewing photographs by the judge and attorneys," or (7) that Polland was involved with the judges in viewing pictures of potential adoptive children and deciding

34

who gets adopted. In fact, Burkholder denied saying anything that would make Ketterman believe that Polland "was involved in any form of corruption."

Ketterman argues in her reply brief that Burkholder's testimony amounts to "simply a conflict in testimony" and "[c]onflicting testimony is a far cry from establishing that Ms. Ketterman's allegations had no basis in law or fact." It was within the trial court's power as factfinder, however, to evaluate the credibility of the witnesses and resolve any conflicts in their testimony. *See Alpert*, 178 S.W.3d at 412 (stating trial court entitled to evaluate credibility of testimony and determine what weight to give it). Here, aside from denying saying anything that would have led Ketterman to believe that Polland was involved in any corruption, Burkholder also testified that he had only one brief conversation with Ketterman, which he believed occurred *after* Ketterman filed her Second Amended Petition in Intervention. Thus, Burkholder's testimony not only conflicts with Ketterman's testimony but also undermines Ketterman's position that she made a reasonable inquiry into the legal and factual basis of her claim that Polland "orchestrates most of the adoption scandal" *before* she filed the Second Amended Petition in Intervention. *See Loeffler*, 211 S.W.3d at 348 (stating trial court must objectively ask whether counsel made reasonable inquiry into legal and factual basis of claim at time pleading filed as part of determination of groundlessness); *see also* TEX. R. CIV. P. 13 ("signatures of attorneys . . . constitute a certificate by them that . . . to

the best of their knowledge, information and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment").

As such, some evidence supports the trial court's conclusion that one or more of Ketterman's allegations of corruption with respect to Polland were groundless. Thus, the first prong of the test justifying the imposition of sanctions under Rule 13 is satisfied.

With respect to the second prong, Ketterman argues that there is no evidence that she signed either pleading in bad faith or with the intent to harass. Ketterman points to the fact that she expressly denied any animosity toward Polland and that neither pleading was signed with such purpose. Furthermore, Ketterman contends that there is no evidence of bad faith or intent to harass because, as she explained to the trial court, she amended her original petition in intervention only because she was required to do so after the court sustained a motion for special exceptions that Polland brought on the Knights' behalf.

Contrary to Ketterman's position, the evidence in this case shows that the trial court made a reasonable inference, even in the absence of direct proof, that Ketterman filed at least one of her pleadings in bad faith or with the intent to harass. *See Schexnider*, 953 S.W.2d at 441–42 (holding intent under Rule 13 may be shown with circumstantial evidence; stating courts may draw reasonable

36

inferences from evidence for purposes of Rule 13). In particular, there was evidence from which the court could reasonably infer that Ketterman filed her second amended petition—which made groundless accusations against Polland—in retaliation for Polland's representation of the Knights, and in particular, for filing a motion for special exceptions on behalf of the Knights.

Specifically, Ketterman admitted sending a text message to the child's attorney at litem on April 5, 2012 stating that she was amending her petition and that Polland "should be careful what he asks for." When questioned further about her April 5th statement, Ketterman denied that the statement was intended as a threat and explained, "It was just that I was gonna be talking about things that I didn't know—I mean that [Polland] wasn't gonna be happy about." The trial court could reasonably infer from this statement that Ketterman knew that, at a minimum, Polland would be annoyed and alarmed by the allegations leveled against him in the second amended petition before she filed the pleading less than a week later. *See Parker*, 233 S.W.3d at 540 ("Harassment means that the pleading was intended to annoy, alarm, and abuse another person."). The reasonable inference that Ketterman filed the second amended petition in bad faith or with the intent to harass Polland and his clients, is further supported by the fact that Ketterman could or would not explain why she withdrew the second amended

37

petition in intervention only two days after it was filed when she was questioned about her decision to withdraw the pleading during the sanctions hearing.

Ketterman argues that the court cannot consider for purposes of Rule 13 the text messages she allegedly sent to the attorney ad litem because the messages were never admitted into evidence. *See Alejandro v. Bell*, 84 S.W.3d 383, 393 (Tex. App.—Corpus Christi 2002, no pet.) ("In order for the trial court to consider documents as evidence in a rule 13 context, they must be admitted in compliance with the rules of evidence at the evidentiary hearing."). Although printouts of the text messages were not admitted into evidence, unlike in *Alejandro*, Ketterman was questioned about the text messages during both days of the sanctions hearing. Specifically, Ketterman testified that she communicated with the attorney ad litem via text messages about a possible settlement in April 2012, after Polland filed a motion for summary judgment. When the attorney ad litem asked Ketterman if she remembered sending him a text that read, "and I'm quoting. I'm amending my petition per the Court's order. [Polland] should be careful what he asks for," Ketterman responded, "I don't recall it exactly, but if you say so, yes." Ketterman testified that she responded to the ad litem's April 5, 2012 text messages with a "pretty scathing retort regarding Mr. Polland." She also acknowledged that she filed the second amended petition in intervention in which she alleged that Polland was "corrupt and engaged in adoption scandals" only a few days after she made

these "scathing remarks" about Polland to the attorney ad litem. When questioned further, Ketterman denied that her April 5th text message to the ad litem in which she stated that Polland "should be careful what he asked for" was intended as a threat. Thus, even though the text messages were not admitted into evidence, Ketterman's testimony in which she admitted to sending a text message to the attorney ad litem in April 2012, stating that she was amending her petition and that Polland should be careful what he asks for, was before the court.

Ketterman further contends that even if her statement was properly admitted, the sentiment that one should be careful what one asks for "certainly holds true in any situation" and does not necessarily demonstrate any intent to harass on her part. Although the statement may be subject to multiple inferences, as Ketterman suggests, it does not mean that the trial court abused its discretion by reasonably inferring that Ketterman filed the second amended petition in retaliation against Polland—particularly in light of the ad hominem attacks directed against Polland in the petition (e.g., Polland is "in the middle of the corruption that goes on-on a daily basis between CPS, the juvenile courts and a handful of attorneys ad litem," "Polland orchestrates most of the adoption scandal and makes his fortune off of the County").

In addition to the text messages, the trial court's implicit finding that these groundless allegations against the Knights and Polland were filed in bad faith or

39

with the intent to harass is bolstered by statements from Ketterman's own clients. The record reflects that the Kelletts admitted during the home study that they did not want to care for D.G.C. long term. At a minimum, this evidence raises the question of how Ketterman's allegations of corruption and bias in favor of foster parents over blood relatives for *purposes of adoption* could have benefited or furthered the interests of her clients—who by their own admission did *not* want to adopt D.G.C.

Taken as a whole, all of these circumstances provide evidence supportive of the trial court's implicit finding that these groundless allegations against the Knights and Polland were filed in bad faith or with the intent to harass, and, as such, the second prong of the test justifying the imposition of sanctions under Rule 13 is satisfied. *See Robson*, 267 S.W.3d at 407 (reviewing record for any evidence supporting trial court's implicit finding that claim was brought in bad faith or for purposes of harassment).

We overrule Ketterman's challenge to the trial court's imposition of sanctions against her based on Rule 13.[11] We do not do so lightly, however, particularly given the gravity of Ketterman's allegations—allegations which we

---

[11]  Having done so, we need not consider her remaining issues which pertain to the trial court's imposition of sanctions pursuant to Chapter 10 and the court's inherent authority. *See Zeifman v. Nowlin*, 322 S.W.3d 804, 809 (Tex. App.—Austin 2010, no pet.) (stating trial court's imposition of sanctions can be affirmed on any legal basis relied upon by court).

neither reach nor express any opinion as to their ultimate merits. Our decision is based on the specific facts of this case, including Ketterman's decision to raise her allegations of corruption and bias in sworn pleadings, and her repeated refusal to provide a factual basis for her claims, despite being given multiple opportunities to do so by the trial court during three separate days of hearings over a two-month period.

Although attorneys have an ethical obligation to zealously represent their clients, an attorney may not use court filings to make serious allegations against the courts or other attorneys and then refuse to answer questions regarding those allegations in open court or offer evidence in support of those allegations when given the opportunity to do so by a trial court.

## Conclusion

We affirm the trial court's judgment.

Jim Sharp
Justice

Panel consists of Justices Jennings, Sharp, and Brown.